JD:JEA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FOLLOWING FACEBOOK ACCOUNT: FACEBOOK USERNAME "LEON RUSSELL," ASSOCIATED WITH USER ID NUMBER 100001100116622 AND URL HTTPS:// WWW.FACEBOOK.COM/LEON.RUSSELL.355; THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC | **APPLICATION FOR A SEARCH WARRANT FOR INFORMATION IN POSSESSION OF A PROVIDER (FACEBOOK ACCOUNT)** Case No. 18-MJ-1203 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, LAEJON BROOKS, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook Account, specifically Facebook Username "Leon Russell" associated with Facebook user ID 100001100116622 and the URL https://www.facebook.com/leon.russell.355 (the "RUSSELLL ACCOUNT") ( the "Subject Facebook Account") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the

government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

    2.     I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives since November 2016 and am currently assigned to the New York Office.  I am currently assigned to the Joint Firearms Task Force and have investigated violations of criminal law relating to firearms offenses.  I have gained expertise in this area through classroom training and daily work conducting these types of investigations.  As part of my responsibilities, I have been involved in the investigation of numerous firearms trafficking and other weapons charges.  During the course of those investigations, I have conducted or participated in surveillance, undercover transactions, the execution of search warrants, and debriefings.  As a result of my training and experience, I am familiar with the techniques and methods used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

    3.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 United States Code, Sections 922(j) (possession and sale of stolen firearms), 924(c)(1)(A)(i) (using, carrying and possessing a firearm), and Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute narcotics), have been committed by BAILEE CAMERON, SCOTT FURNESS, JENNIFER GRIFFIN, RICARDO RAMOS, KEN STONE, KAYLA RAMOS, GREG MILLER; TASHA GRAM and LEON RUSSELL.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### A. The Instant Offenses

5.      I have been involved in the investigation of an individual named KELVIN STICHEL.  On July 6, 2018, KELVIN STICHEL shot a New York Police Department ("NYPD") detective while NYPD officers were executing an arrest warrant on STICHEL in the vicinity of 39 Kingston Avenue, Brooklyn, New York.  The firearm used by STICHEL was an Armscor of the Philippines, model M1911-A1 FS, black .45 caliber pistol, serial number RIA1888029, with wood grips (the "Member of Service firearm" or "MOS firearm").  Law enforcement initiated an urgent trace of the MOS firearm and determined that the purchaser and owner of the MOS firearm was HENRY DUVAL, a resident of 73 Plain Street, Rutland, Vermont.  Law enforcement further learned that the MOS firearm was purchased along with two additional rifles in October 2017.

6.      In July 2018, law enforcement interviewed JENNIFER GRIFFIN regarding the investigation into the MOS firearm.  GRIFFIN explained that in November 2017, BAILEE CAMERON, DUVAL's granddaughter, sent a message from her Facebook account with the Facebook Username "Bailee Morgan Cameron" associated with the URL https://www.facebook.com/baileeeeeeeeeeeeee (the "CAMERON ACCOUNT") to GRIFFIN's Facebook account with Facebook Username "Jennifer Griffin" associated with the URL https://www.facebook.com/lovemybabbys (the "GRIFFIN ACCOUNT") asking GRIFFIN if

3

she knew anyone who would trade heroin for a firearm. GRIFFIN stated that CAMERON explained on Facebook that she received the firearm from her brother. GRIFFIN further explained that in November 2017, GRIFFIN drove CAMERON and SCOTT FURNESS, GRIFFIN's son and CAMERON'S then boyfriend, to GREG MILLER's house, a known drug dealer, to sell the firearm for heroin. GRIFFIN described the firearm that was sold to MILLER as a black .45 caliber handgun with wood handles.

7.     GRIFFIN also provided law enforcement with screenshots of multiple Facebook conversations between the CAMERON ACCOUNT and the GRIFFIN ACCOUNT regarding firearms. In addition, GRIFFIN stated that CAMERON sent a picture of the .45 caliber handgun, which matches the description of the MOS firearm, from the CAMERON ACCOUNT to the GRIFFIN ACCOUNT, prior to selling the firearm to MILLER.

8.     In July 2018, law enforcement also interviewed FURNESS regarding the sale of the MOS firearm. FURNESS stated in sum and substance that although he has never seen CAMERON steal a firearm, CAMERON told FURNESS that she had stolen firearms previously. FURNESS also explained that while he did not break into DUVAL's vehicle, he was aware that a .45 caliber firearm went missing from DUVAL's vehicle. FURNESS also explained that in November 2017, GRIFFIN drove FURNESS, CAMERON and RICARDO RAMOS, FURNESS's father, to MILLER's house to sell the MOS firearm for heroin. FURNESS stated that he was aware from his Facebook Account with the Facebook Username "Scott Furness" associated with Facebook user ID 107624579802485 and the URL https://www.facebook.com/scott.furness.35 ("FURNESS ACCOUNT") and the GRIFFIN ACCOUNT that CAMERON would send pictures of firearms and communicate about selling firearms for heroin from the CAMERON ACCOUNT.

4

9.     In addition, law enforcement interviewed CAMERON regarding the sale of the MOS firearm.  CAMERON explained that she had previously stolen firearms from both of her grandfathers, DUVAL and TOM WEST.  CAMERON further stated that she had previously stolen firearms and sold them for heroin.  In contrast to GRIFFIN and FURNESS, CAMERON stated that FURNESS broke a window in DUVAL's vehicle and stole the MOS firearm.  CAMERON stated that she did not recall sending photographs of firearms from the CAMERON ACCOUNT to the GRIFFIN ACCOUNT or FURNESS ACCOUNT.

10.    On August 31, 2018, the Honorable Vera M. Scanlon, U.S.M.J., issued a search warrant for information associated with three Facebook accounts.  See 18-M-814.  On September 6, 2018, the Honorable Peggy Kuo, U.S.M.J. issued a search warrant for information associated with the same three Facebook accounts based on an amended application regarding certain information associated with the Facebook accounts that was required.

11.    I have reviewed the return for the GRIFFIN ACCOUNT which shows communications with four additional Facebook Accounts, specifically (1) Facebook Username "Ken Stone" associated with Facebook user ID 100002083799091 and the URL https://www.facebook.com/ken.stone.12576 (the "STONE ACCOUNT"); (2) Facebook Username "Kayla Maria Ramos (babykaay)" associated with Facebook user ID 100009027936880 and the URL https://www.facebook.com/100009027936880 (the "RAMOS ACCOUNT"); (3) Facebook Username "Greg Miller" associated with Facebook user ID 100000138361243 and the URL https://www.facebook.com/Greg.Miller.VT (the "MILLER ACCOUNT"); and (4) Facebook Username "Tasha Gram" associated with

5

Facebook user ID 100007487791111 and the URL https://www.facebook.com/budzz0512

(the "GRAM ACCOUNT") regarding the Subject Offenses, including communications regarding

the sale of the MOS Firearm.  For instance, on November 18, 2017, the GRIFFIN ACCOUNT

and STONE ACCOUNT communicated regarding the sale of the MOS Firearm for narcotics.

Specifically, the following exchange occurred:

> Griffin:        Can you get rid of a 45?  Pistol
>
> Stone:         Ya.  How much?
>
> Griffin:        2 buns.  Or $100 of up and a b.

12.     The GRIFFIN ACCOUNT thereafter sent a photo to the STONE ACCOUNT of a

black .45 caliber pistol, with wood grips and serial number RIA1888029, which I have

confirmed is the MOS Firearm.  Eventually, the STONE ACCOUNT agreed to pay $400 for the

MOS Firearm and the GRIFFIN ACCOUNT agreed to deliver the MOS Firearm to 110 Stony

Drive, Fair Haven, CT 05743.  Based on my training and experience, the GRIFFIN

ACCOUNT's reference to "2 buns" is a reference to two bundles (or 20 glassines) of heroin.

13.     The GRIFFIN ACCOUNT also communicated with the RAMOS ACCOUNT

about the sale of firearms.  Specifically, on January 25, 2018, the RAMOS ACCOUNT contacted

the GRIFFIN ACCOUNT about selling a firearm.  During that communication, the RAMOS

ACCOUNT stated that she was trying to sell the firearm to DUVAL, her grandfather, for cash to

buy narcotics, but she was unsuccessful.  Eventually, the RAMOS ACCOUNT told the GRIFFIN

ACCOUNT that she had found someone to buy the gun but needed the GRIFFIN ACCOUNT to

pick up the gun and to hurry because she didn't "wanna have a FUCKING gun in the school so

go!!"

14.    In addition, the GRIFFIN ACCOUNT had communications with the GRAM ACCOUNT regarding the sale of firearms and narcotics. On June 16, 2018, the GRIFFIN ACCOUNT stated that she wanted to meet "to sell bupe" so that she could "get hard" and asked the GRAM ACCOUNT for a ride. Based on my training and experience, the GRIFFIN ACCOUNT's reference to "bupe" is to buprenorphine, an opioid used to suppress opioid withdrawal.

15.    THE GRAM ACCOUNT responded that she did not have a vehicle to use but that she "got a gun for Shawn." Later that day, the GRIFFIN ACCOUNT asked THE GRAM ACCOUNT if she was "selling the gun to adam?" The GRAM ACCOUNT said that she might but that "it depends on what he going to pay." THE GRIFFIN ACCOUNT then requested that the GRAM ACCOUNT bring the firearm to where they were going to meet.

16.    Finally, the GRIFFIN ACCOUNT also communicated with the MILLER ACCOUNT regarding the MOS Firearm and the investigation. On August 9, 2018, the following exchange occurred:

Miller:      . . . idk why but atf called me after talking to scotty last
             laast week

Griffin:     Yea they came here too something about bailee selling a
             stolen gun and a cop was shot with it. Idk bailee sent them
             to scotty then to me and kayla and they went to ricks work.

. . .

Miller:      https://pix11.com/2018/07/06/nypd-police-officer-shot-in-brooklyn-cops/

Griffin:     Idk whst this is all about oh and something about Dakota
             too that he may have bought it off you. Cuz bailee
             supposably said she sold you a gun. Idk I don't remember
             anything about it. I told them I knew nothing about a gun.

7

> Miller:     I only bought a muzzle loader. . . either way scotty
>             shouldn't talk

17.     On November 5, 2018, the Honorable Roanne L. Mann, U.S.M.J., issued a
search warrant for information associated with the STONE ACCOUNT, RAMOS ACCOUNT,
MILLER ACCOUNT and the GRAM ACCOUNT.  See 18-M-1054.

18.     I have reviewed the returns for the STONE ACCOUNT and MILLER
ACCOUNT which shows communications regarding the MOS firearm.  On November 18, 2017,
the following exchange occurred:

> Stone:      Yo I got a 45.  For three buns
>
> Miller:     k get sleeves for that.
>
> Stone:      Right now.  As long as I go with then ya

Based on my training and experience, the STONE ACCOUNT's reference to "three buns" is a
reference to three bundles (or 30 glassines) of heroin.  Further, the MILLER ACCOUNT's
reference to "get sleeves for that" is a reference to a sleeve (or 10 bundles) of heroin.

19.     The STONE ACCOUNT thereafter sent a photo to the MILLER ACCOUNT (the
same photo sent by the GRIFFIN ACCOUNT) of a black .45 caliber pistol, with wood grips and
serial number RIA1888029, which I have confirmed is the MOS Firearm.  The next day, the
MILLER ACCOUNT asked "Still got that burner," which the STONE ACCOUNT replied "Na.
Tht been gone."  Based on my training and experience, the MILLER ACCOUNT's reference to
"that burner" is a reference to the MOS Firearm.

20.     I have also reviewed the MILLER ACCOUNT which shows communications
regarding the MOS firearm between the MILLER ACCOUNT and the RUSSELL ACCOUNT.
On November 27, 2017, the following exchange occurred:

| Russell: | What up |
|---|---|
| Miller: | Make sure you pass that strap you picked up this week. And careful heard Ken was gonna try and get you.  I was tight you got it before me. |
| Russell: | Already gave the rachet strap away n he can trying all done. |
| Miller: | I heard about that strap from someone who isent in the game. |
| . . . | |
| Miller: | Skstched when I heard that.  How's you. |
| Russell: | Good look n im ok. |

Based on my training and experience, the MILLER and RUSSELL ACCOUNTs' references to "strap" and "rachet strap" are references to a firearm.  Further, there is reason to believe based on this conversation that the firearm that they are discussing is the MOS firearm.

21.     Accordingly, based on the information described above, there is probable cause to conclude that the Subject Facebook Account contains evidence, such as photographs and communications, related to possessing and selling a stolen firearm in violation of Title 18, United States Code Section 922(j), conspiracy to distribute and possess with intent to distribute narcotics in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and using, carrying and possessing a firearm, in violation of Title 18 United States Code, Section 924(c)(1)(A)(i).

**B. Background Regarding Facebook**

22.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

24.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

10

26.     Facebook users can create profiles that include photographs, lists of personal
interests, and other information.  Facebook users can also post "status" updates about their
whereabouts and actions, as well as links to videos, photographs, articles, and other items
available elsewhere on the Internet.  Facebook users can also post information about upcoming
"events," such as social occasions, by listing the event's time, location, host, and guest list.  In
addition, Facebook users can "check in" to particular locations or add their geographic locations
to their Facebook posts, thereby revealing their geographic locations at particular dates and
times.  A particular user's profile page also includes a "Wall," which is a space where the user
and his or her "Friends" can post messages, attachments, and links that will typically be visible
to anyone who can view the user's profile.

27.     Facebook allows users to upload photos and videos, which may include any
metadata such as location that the user transmitted when s/he uploaded the photo or video.  It
also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.
When a user is tagged in a photo or video, he or she receives a notification of the tag and a link
to see the photo or video.  For Facebook's purposes, the photos and videos associated with a
user's account will include all photos and videos uploaded by that user that have not been
deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28.     Facebook users can exchange private messages on Facebook with other users.
These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on
Facebook, which also stores copies of messages sent by the recipient, as well as other
information.  Facebook users can also post comments on the Facebook profiles of other users or
on their own profiles; such comments are typically associated with a specific posting or item on
the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant

11

messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

31.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

34.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which

are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

35.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

38.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

13

39.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

40.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and

14

geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

41.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

42.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

15

## CONCLUSION

43.    Based on the forgoing, I request that the Court issue the proposed search warrant.

44.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

45.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

46.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is not public.  Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the

investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

Respectfully submitted,

LAEJON C. BROOKS
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to before me on December 11, 2018

HONORABLE STEVEN L. TISCIONE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

17

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook Account: Facebook Username "Leon Russell" associated with Facebook user ID 100001100116622 and the URL https://www.facebook.com/leon.russell.355; that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody,

or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or

information that have been deleted but are still available to Facebook, or have been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the

following information to the government for the user IDs listed in Attachment A:

(a)      All contact and personal identifying information, including, for the Subject

Facebook Account, full name, user identification number, birth date, gender,

contact e-mail addresses, Facebook passwords, Facebook security questions and

answers, physical address (including city, state, and zip code), telephone numbers,

screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts

and other Facebook activities;

(c)      All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them;

(d)      All profile information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and
instrumentalities of communications containing violations of Title 18 United States Code,
Sections 922(j) (possession and sale of stolen firearms), 924(c)(1)(A)(i) (using, carrying and
possessing a firearm), and Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy
to distribute narcotics) (the "Subject Offenses"), all involving BAILEE CAMERON, SCOTT
FURNESS, JENNIFER GRIFFIN, RICARDO RAMOS, KEN STONE, KAYLA RAMOS,
GREG MILLER, TASHA GRAM and LEON RUSSELL since June 1, 2017, including, for the
user IDs identified on Attachment A, information pertaining to the following matters:

     (a) Communications involving the Subject Facebook Accounts;

     (b) Evidence indicating how and when the Facebook account was accessed or used,
to determine the chronological and geographic context of account access, use, and
events relating to the crime under investigation and to the Facebook account
owner;

     (c) Evidence indicating the Facebook account owner's state of mind as it relates to
the crimes under investigation;

     (d) The identity of the person(s) who created or used the user IDs, including records
that help reveal the whereabouts of such person(s);

     (e) The identity of the person(s) who communicated with the Subject Facebook
Accounts about matters relating to the Subject Offenses, including records that
help reveal their whereabouts.

3